UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SHAUNTAY WATKINS,

                    Plaintiff,                          **OPINION AND ORDER**

            v.                                          16 Civ. 4161 (ER)

NEW YORK CITY TRANSIT
AUTHORITY,

                    Defendant.

Ramos, D.J.:

        In 2016, Shauntay Watkins ("Watkins" or "Plaintiff") brought suit against her

former employer, the New York City Transit Authority ("NYCTA" or "Defendant"), for

workplace discrimination on the basis of her race in violation of 42 U.S.C. § 1981 and the

New York City Human Rights Law ("NYCHRL").[1] Doc 1. Watkins, an African

American woman, alleged that while she was a probationary employee of NYCTA,

fellow probationary employee Tequisha Jenkins ("Jenkins"), a darker-skinned African

American woman, repeatedly directed race-based insults at her during their training

sessions, within earshot of their fellow students and instructors.  Doc 1, ¶¶ 13-18.

Following dismissal on summary judgment of related aiding and abetting and retaliation

claims, the Court held a four-day trial on the sole remaining issue of whether NYCTA

had allowed a hostile work environment to exist during Watkins' training in

contravention of Federal and City law.  Docs. 50, 11-18; 106-1 ("Tr.").

        At trial, Watkins, her former therapist, her husband, two of her former classmates,

five of her former instructors, and the director of her NYCTA training testified.  The jury,

---

[1] Plaintiff stipulated to voluntarily dismiss her claims against New York City on June 30, 2016, and
withdrew her claim under Administrative Code § 8-107(19) on January 31, 2018.  Docs. 12; 49, 1.

finding Watkins had not proven a hostile work environment, returned a verdict in favor of NYCTA.  Tr. 718:13-19:2.

Presently before the Court is Watkins' motion for a new trial pursuant to Rule 59. Doc. 105.  Watkins contends that the trial court erred in directing the jury not to consider evidence of an incident that led to her termination in determining whether a hostile work environment existed.  Doc. 107.  Defendant argues that the jury was properly instructed because, *inter alia*, the incident and her subsequent termination related to the retaliation claim that the Court dismissed on summary judgment.  Doc. 111.  For the reasons stated below, Plaintiff's motion is DENIED.

## I.      Factual Background

Watkins and Jenkins were part of the September 28, 2015 induction class of train operators at the NYCTA.  Doc. 1, ¶¶ 12-13.  Watkins claims that she was targeted by Jenkins, a black woman, for being a lighter-skinned black woman. Doc. 1, ¶ 14.  Watkins alleged that, beginning in October 2015, Jenkins began calling her racially-charged terms including fake, phony, Oreo,[2] Rasputia,[3] black girl, dirty blonde, and uppity on a regular basis in class.  Doc. 1, ¶¶ 15, 17.  Plaintiff further alleged that Jenkins threatened her and made sounds, such as honking, sucking her teeth, and hissing, during their instruction.

---

[2] The term "Oreo" is typically used disparagingly to refer to "a black person who adopts the characteristic mentality and behavior of white middle-class society."  Oreo, Merriam-Webster.com Dictionary, https://www.merriam-webster.com/dictionary/Oreo. It derives from the trademark chocolate cookie with a white filling and refers to someone who allegedly is black on the outside but white on the inside. *Id. See also* Doc. 1, ¶ 15 n.1.

[3] Rasputia is a "large and boisterous" black character in the film Norbit who critics say embodies the "mammy" stereotype for black women. "Rasputia: A Comic Type, or a Racial Stereotype," NPR.org, https://www.npr.org/templates/story/story.php?storyId= 7608400 (Feb. 26, 2007).  *See also* Doc. 1, ¶ 15 n.2.

Doc. 1, ¶ 16.  According to Plaintiff, Jenkins often imitated a valley girl accent, called her a dumb blonde, and told her that she did not speak "black enough."  Doc. 1, ¶ 17.

On February 21, 2016, both women took part in an exercise with their class on how to properly start a train.  Doc. 1, ¶ 23.  Watkins, from the cab of the train, inserted the console key, which automatically turned on the sealed beam headlights at the front of the train.  *Id.*  Jenkins, who was still on the tracks and immediately in front of the train, was apparently initially startled and then was angered.  *Id.*  Watkins alleged that, though she apologized, Jenkins shouted curses at her, asked why she would turn the sealed beams on when someone was on the roadbed, and threatened her.  Doc. 1, ¶¶ 23-24.  Following the incident, Watkins claims she told their instructors, Train Service Supervisors ("TSS") Carl Barnwell and Karl Afflick, of the history of racial harassment by Jenkins against her and TSS Barnwell instructed her to file a formal incident report, known as a G2.  Doc. 1, ¶ 25.  According to Watkins, she met with Senior Director Kim Gibbs the next day and explained Jenkins' discriminatory behavior.  Doc. 1, ¶¶ 27-28.  Watkins was subsequently terminated, effective March 4, 2016, for violating a NYCTA rule preventing workplace altercations.  Doc. 1, ¶ 33.  Jenkins was also terminated for her role in the argument.  Doc. 1, ¶ 31.

On the basis of these allegations, Plaintiff filed suit, asserting causes of action for discrimination under section 1981 and the NYCHRL against Defendant for, among other things, maintaining a discriminatory work environment and for retaliation.  Doc. 1, ¶¶ 48-62.  On February 13, 2018, the Court denied summary judgment on Watkins' hostile work environment claims, but granted summary judgment with respect to all other claims.  Doc. 50, 6-18.  Specifically, the Court found that Defendant had given a non-

retaliatory reason for Watkins' termination:  she and Jenkins, both probationary

employees, had been fired for violating the Rules and Regulations of NYCTA in carrying

on a verbal altercation.  Doc. 50, 15-16.  Because Plaintiff had proffered no evidence that

NYCTA's reason for the firing was pretextual, the Court dismissed her retaliation claim.

Doc. 50, 16-18.

Pre-trial, NYCTA moved to preclude Watkins' termination as irrelevant to her

remaining hostile work environment claims.  Doc. 70, 5.  Plaintiff argued the February

21, 2016 incident and termination were instead the "culminat[ion of] the hostile work

environment."[4]  Doc. 75, 2.  Consistent with the summary judgment ruling, the Court

allowed Plaintiff to testify about her termination, but limited her testimony to explaining

that she had been involved in an altercation with Jenkins and was subsequently fired.

Doc. 110-3, 32:20-33:8.

### A.    Facts Adduced at Trial

Trial was held from December 17 through 20, 2018.  Throughout trial several

sidebars addressed the contours of the Court's *in limine* ruling to exclude evidence of the

February 21, 2016 incident, the ensuing investigation, and Watkins' subsequent

termination.

Plaintiff testified and presented the testimony of her husband Charles Williams,

her former therapist Dr. James Wadley, former classmates Nevron Stanislaus and Earl

Hall, and NYCTA Senior Director Kim Gibbs.  Defendant presented the testimony of

---

[4]  Plaintiff failed to even raise this argument before opposing NYCTA's motion *in limine* on the eve of trial.  Doc. 111, 16-17.  It is "well within" the Court's discretion to preclude introduction of a new theory of liability that would prejudice the defendant right before trial.  *Stephen v. Hanley*, 376 F. App'x 158, 159-60 (2d Cir. 2010); Tr. 563:20-64:19 (denying Plaintiff's request at the charging conference on the last day of trial to amend complaint to include new theory of hostile work environment including evidence of the February 21, 2016 incident and subsequent investigation because those topics had been precluded since the start of trial).

NYCTA TSS Hector Prieto, John Albanese, Cynthia McCain, Afflick, and Barnwell, and recalled Gibbs.

Watkins' testimony of being harassed by Jenkins in class was neither corroborated by the two classmates she called, nor the five instructors who were called by the defense, the only other possible witnesses to any of the alleged offending behavior. There was also no dispute that Watkins had never reported Jenkins' allegedly discriminatory behavior until the investigation[5] of the February 21, 2016 altercation that led to her termination.

i.     **Plaintiff's Case**.

Watkins testified that she began probationary training as a train operator with NYCTA alongside about ten other students, including Jenkins, on September 28, 2015. Tr. 87:3-11, 88:17-20, 91:1-5.  Watkins, a 38-year-old African American woman, had previously worked for JetBlue Airways, American Express, and had served in the United States Army.  Tr.  84:14-21, 86:10-23, 213:25-14:2.  Watkins testified that she had been enlisted in the Army for approximately 2-3 months, and had served an additional ten years as a volunteer for an affiliated-service, the Veterans of Foreign Wars ("VFW").  Tr. 85:13-86:9, 222:21-22, 268:11-13.  However, on cross-examination, Watkins conceded that she had represented that she had spent "more than a decade serv[ing] in the United States Army" in the complaint, and had written that she had 13 years of Army experience in her second G2 form, without making any distinction between enlisted service and volunteering for the VFW.  Doc. 1, ¶ 12; Tr. 222:11-23:9, 267:14-69:11.

---

[5]  TSS Barnwell and Gibbs dispute that she ever told them Jenkins' behavior was related to race during the investigation.

Watkins testified that during training, Jenkins "constantly made discriminatory comments towards" her about how she looked, how she spoke, and about her not being considered "black enough." Tr. 91:1-11. Though Watkins and Jenkins are both black women, Watkins has a lighter skin tone than Jenkins. Tr. 85:3-5, 98:3-4. Jenkins called Watkins "a black girl with dirty blond hair[,]" an "Oreo[,]" and "Rasputia." Tr. 94:23-95:10, 108:7-23. Jenkins would also "mak[e] honking noises insinuating that [Watkins] did not speak black or mock[ her] dialect in a valley girl accent" when she spoke in class, "[e]ach time [she] sp[oke], each time [she] asked a question, each time [she] had a comment." Tr. 94:23-95:10. Though Watkins first described these incidents as occurring daily throughout their five-month training, she later admitted that she and Jenkins had separate postings for the last two months of their employment during which time Jenkins said nothing to her. Tr. 98:5-8, 201:25-02:4.

In October 2015 when TSS Albanese confused the two women during class, Watkins recounted that Jenkins said, "I don't know why you keep mixing me up with that." Tr. 91:12-92:6. Another time, Watkins asked a question of TSS McCain, in front of TSS Albanese, and Jenkins "hissed and said this Oreo has a question again." Tr. 95:13-96:2. Watkins testified that she sat within a foot of TSS Albanese. Tr. 93:21-94:2. In another instance, Jenkins used a valley girl accent to express a similar sentiment, calling Watkins "this dirty blonde." Tr. 98:13-20. Though at least one other student gave Jenkins ideas for what to say about Watkins in class, Watkins considered Jenkins the real perpetrator of any discriminatory remarks. Tr. 202:5-11.

On the evening of February 21, 2016, Watkins and Jenkins were training with their class to prepare a train for service during their midnight road operations class. Tr.

137:19-38:17, 198:3-6.  Watkins and Jenkins had been assigned to different postings for the two months immediately preceding February 21, 2016, so this was the first time they had direct contact during that period.  Tr. 199:7-200:3.

According to Watkins, when she charged the train, meaning when she put the key in the console to start it, the sealed beams came on and Jenkins, who remained on the tracks, began screaming.  Tr. 139:17-41:25.  Jenkins reportedly said, "so F'ing stupid. Why would you start the F'ing train while people are down here and shine[ the] seal[ed] beams?"  Tr. 139:24-40:1.  Watkins apologized, stating she was not "F'ing stupid," but Jenkins continued, also calling her a fake and a phony, and threatening to "'F' [her] up after [they] g[o]t out of class."  Tr. 141:1-15.  By Watkins' recollection, Jenkins added, "I'll tighten your wig cap up[,]" "[y]ou ain't nothing around here[,]" "[t]hat Army ish don't play around here[,]" and "I got goons to handle you."  Tr. 141:20-22.  Jenkins also described Watkins as "light work."  Tr. 157:4.  While Watkins testified that she did not respond in kind and remained mostly silent, as discussed below, her testimony in this regard was contradicted by Stanislaus and Hall, witnesses she called, as well as TSS Barnwell and Afflick.  Tr. 140:22-24.

TSS Afflick and Barnwell asked what happened and Watkins told Barnwell of Jenkins' antagonism over the course of their training.  Tr. 142:4-13.  Barnwell instructed her to fill out a G2.  *Id*.  Watkins titled her G2 "Harrassment [sic] and Threats" and described Jenkins' reaction to the February 21, 2016 incident as using "obscenities." Doc. 106-3, 7.  Watkins felt "attacked" and noted that she had "been antagonized" by Jenkins, "subjected to her . . . condescending remarks," "aggression," and "blatant disrespect."  Doc. 106-3, 7-8.  She did not mention any discriminatory remarks.

When Watkins said that she hesitated to file the G2 because she feared retaliation, the Court held a sidebar to address Defendant's objection. Tr. 147:9-17. Plaintiff argued the jury would want a reason why Watkins did not previously report, and Defendant contended such testimony was an attempt to revive the summarily-dismissed retaliation claim. Tr. 148:9-49:3. In sustaining Defendant's objection, the Court noted that the jury was unlikely to question why Watkins had not filled out a G2 about any discrimination allegations because she had eventually done so in relation to the February 21, 2016 incident. Tr. 149:4-6.

When Watkins then began to testify about what happened after the February 21, 2016 class, the parties held another sidebar at Plaintiff's request. Tr.157:10-12. The Court directed that, "The story that needs to get before the jury is . . . . [s]he was directed to be present at meetings. She provided information about the altercation. She received a termination letter on March the 4th, . . . . That's it." Tr. 160:12-17.

Watkins testified that after filing the G2, she met with Gibbs and explained Jenkins' discriminatory behavior over the course of their training. Tr. 162:10-63:19. According to Watkins, Gibbs told her that she did not believe Watkins, and that she believed Watkins had intentionally turned the sealed beams on because she would have seen Jenkins on the tracks given that all of the trainees wore reflective vests and carried flashlights. Tr. 163:20-64:12. Watkins countered that Jenkins had been in her blind spot. Tr. 164:13-65:3. Gibbs told Watkins to return to class and kept Jenkins back from instruction. Tr. 166:3-20. Watkins only attended one more session before she was fired, effective March 4. Tr. 167:13-15, 224:23-25:3.

When Watkins was asked more in-depth questions about after the altercation, the parties again had a sidebar regarding Defendant's objection at which the Court explained, "What happened after the altercation, as far as this jury is concerned, is she went back to work for a couple of days, she . . . filled out the G2, she met with Ms. Gibbs, [and then was] given a letter that she was terminated, period."  Tr. 173:3-6.

Watkins admitted not reporting any discrimination prior to her conversation with TSS Barnwell on February 21, 2016.  Tr. 272:19-25.  But, she claimed, their instructors and fellow classmates were in the room when Jenkins made these allegedly discriminatory comments in class throughout the course of their training.  Tr. 99:22-24. She identified TSS Albanese, McCain, and Prieto, and classmate Nevron Stanislaus, among others, as witnesses to the harassment.  Tr. 93:21-94:2, 95:13-96:2, 105:9-07:18. Though Watkins at first testified that Jenkins made discriminatory remarks every day for the duration of their five-month training, on cross-examination she conceded that she and Jenkins had been assigned to different jobs for the two months leading up to the February 21, 2016 class with no interaction.  Tr. 199:25-200:3.  She also admitted that she did well in training despite Jenkins' behavior.  Tr. 252:13-15.

Watkins admitted receiving the NYCTA rulebook prohibiting altercations[6] and workplace manual detailing their antidiscrimination policy.[7]  Tr. 254:17-60:21, 628:13-

---

[6] Rule 10 of the NYCTA Rules & Regulations governs the conduct of employees.  Doc. 110-2, 3. Specifically, under Rule 10(d), NYCTA employees are prohibited from using "loud, uncivil, indecent or profane language, even under the greatest provocation."  *Id.*

[7] NYCTA's antidiscrimination policy states that NYCTA strives to "maintain a work environment free of all forms of discriminatory harassment[,]" including "[d]iscriminatory harassment . . . based on race [and] color."  Doc. 110-1, 1.0, 4.0.  The policy strictly prohibits the use of "racial epithets, inappropriate ethnic jokes, comments, innuendo, or other commentary made to demean or embarrass" with the threat of disciplinary action including termination.  *Id.*, 4.1, 6.0, 7.0.  The policy also tasks supervisors with "ensuring the workplace is free of all forms of discriminatory harassment[,]" reporting offending behavior

31:2.  Watkins believed, however, that these policies were inconsistent with what she saw in practice at the NYCTA.  Tr. 275:25-76:10.  And, though she had previously reported discrimination at her prior job at JetBlue for their failure to promote black women, unlike at NYCTA, Watkins felt encouraged to make complaints at JetBlue.  Tr. 213:25-14:10, 281:3-11.

Watkins testified that she told her husband, friends, and later, her therapist, about the discrimination, which caused her to become depressed.  Tr. 103:4-16, 179:10-80:8.  Watkins' husband, Williams, testified that his wife had confided in him about Jenkins' behavior starting in October 2015 and that he had advised her to ignore it.  Tr. 361:22-62:18.  He further testified that she had been withdrawn and depressed, but by mid-October her mood had improved.  Tr. 360:8-25, 371:14-72:2.  He also testified that, from his recollection, she had attended therapy three days a week from April until June 2016, but that she had to stop for financial reasons.  Tr. 364:1-5, 373:4-74:8.

Psychologist Dr. James Wadley testified that Watkins had actually visited his office only three times from June to July 2016.  Tr. 56:10-20.  He did not recall their specific discussions, but had notes that they discussed colorism, or discrimination based on skintone. Tr. 36:20-37:4.

Stanislaus, a fellow student, testified that he initially had not wanted to fill out a G2 because he did not want to get involved.  Tr. 292:7-22.  He heard both Watkins and Jenkins screaming and cursing on February 21, 2016.  Tr. 322:2-25.  In his G2 documenting the February 21, 2016 incident, however, he wrote that he did not witness anything and that he had not seen Watkins and Jenkins interact.  Doc. 106-4, 9.  Prior to

"as soon as they become aware of such complaints," and taking "immediate action to stop such harassment."  *Id.*, 5.0.

that incident, he had heard Jenkins say at lunch that Watkins was fake or phony because of how she embellished her military service, but that was outside of the presence of Watkins or their instructors.  Tr. 323:1-24:13.

Hall, another fellow student, testified that he never heard Jenkins say anything about Watkins in class.  Tr. 428:3-24.  While he heard raised voices from both women during the February 21, 2016 incident, he denied hearing any threats of physical harm.  Tr. 431:23-32:1, 442:15-24.  Consistently, Hall's G2 reported that he heard the two women arguing over the sealed beams being turned on as Jenkins entered the train, but that he just continued to prepare the train for service.  Doc. 106-3, 7.

Gibbs testified that she was Senior Director of NYCTA in 2016.  Tr. 376:10-17.  Following the February 21, 2016 incident, she met with Watkins and reviewed her G2.  377:17-23.  During their meeting, Watkins told Gibbs that she believed Jenkins did not like her because she was lighter-skinned, younger, prettier, and had longer hair.  Tr. 399:14-400:12.  Gibbs denied that Watkins told her that she had been called an Oreo or that she was experiencing any discrimination.  *Id.*  Gibbs admitted that she had testified that Watkins had told her about being called an Oreo at her pretrial deposition, but then corrected that testimony during the deposition itself to reflect that she had read an article mentioning the term and had not been told it by Watkins.  Tr. 408:6-09:13, 416:11-19.  At her deposition, Gibbs had also said that Watkins believed Jenkins saw her as acting white.  Tr. 420:3-19.

11

###### ii.      Defendant's Case.

TSS Prieto, Albanese[8], McCain[9], Barnwell, and Afflick testified that at no time during classroom instruction did they hear Jenkins call Watkins any racial names or direct any racial insults at Watkins, and that Watkins never complained to them about any racial harassment at the hands of Jenkins prior to filing her G2.  Tr. 465:9-66:24, 485:8-88:14, 499:23-500:22, 519:7-21, 542:16-25, 587:24-88:23.  They all testified that, had she done so, they would have directed her to write a G2 and escalated the complaint to their supervisory staff.  Tr. 467:15-68:5, 488:23-89:5, 501:9-19, 518:22-19:6, 589:1-6. Ignoring such a report, they similarly agreed, could have cost them their jobs.  467:6-68:5; 488:23-89:5, 501:20-24, 520:13-21, 589:7-22.

TSS Barnwell testified that on February 21, 2016, he was teaching alongside TSS Afflick and the students had gone ahead to check the train.  Tr. 514:4-18.  The lights of the train went on and there was a verbal confrontation between yelling female voices.  Tr. 514:23-15:14.  When he reached the train, Watkins was alone in the operating cab and Jenkins was in the passenger compartment.  Tr. 515:18-16:6.  Watkins said she put the lights on and tried to charge the train, and Jenkins became visibly upset.  *Id.*  In TSS Barnwell's opinion, it was "premature" to charge the train because it had not been fully checked.  Tr. 518:2-6.  He also testified that people wearing safety vests are visible from

---

[8] Albanese, now retired, acknowledged that he had to undergo additional training as an instructor because of student complaints.  Tr. 495:4-96:3.

[9] McCain had no specific recollection of Watkins or what happened in her class. Tr. 499:13-18, 509:2-3.

the operator's cab of the train.  Tr. 541:9-24.  He directed the whole class to write G2s

about the incident.  Tr. 518:22-19:6, 521:6-19.[10]

Watkins told TSS Barnwell that Jenkins had been harassing her for five months,

but did not say that it was because of her race.  Tr. 544:20-23.  Despite Watkins' report of

harassment, TSS Barnwell did not include it in his own G2, which said only that he

observed "some exchange of words" between Watkins and Jenkins on February 21, 2016.

Tr. 527:17-28:11, Doc. 106-3, 5.

TSS Afflick testified that on February 21, 2016, he and TSS Barnwell heard

"some commotion" and once they got to the train they inquired and found out "[t]here

was an argument between two of the students."  Tr. 585:15-86:1.  Watkins had turned on

the sealed beams and, because they can startle or temporarily blind a person, Jenkins

thought it was intentional.  Tr. 587:24-88:6.  According to TSS Afflick, Watkins had

turned on the train too soon because it takes approximately 30 minutes to clear a train for

service, even with several employees working as a group.  Tr. 592:7-17, 597:3-13.

Following the incident, Watkins did not report any discrimination to him and he asked

the parties to write G2s.  Tr. 588:12-23, 598:5-16.  Rather than submitting his own G2,

TSS Afflick signed on to the one prepared by TSS Barnwell.  Tr. 598:17-601:18.

When recalled by the defense, Gibbs further testified that she presents to all

trainees during their first week about administrative matters and the respectful workplace

policy.  Tr. 605:25-08:3.  The first day and a half of induction week consists of reviewing

policies and procedures, and the students receive the rulebook and the manual.  Tr.

611:14-12:5.  During the first week of training, the students review Rules 1 through 37.

---

[10] In her G2, Jenkins described Watkins as "very threatening and irate" and explained that Watkins "continued to raise her voice" during their altercation.  Doc. 106-3, 6.

Tr. 617:5-12.  Rule 10, prohibiting verbal altercations in the workplace, was the basis of

terminating Watkins and Jenkins.  Tr. 634:13-16; Doc. 110-2, 3; *see supra* 9 n.6.  She

does not, however, go over the G2 process with students; that is tasked to the instructors.

Tr. 646:6-15.

> **B.**     **The Jury Charge**

Defendant proposed a special instruction precluding the jury from considering the

NYCTA investigation in assessing the hostile work environment claims or damages.  Tr.

558:17-59:10.  Plaintiff responded that, while relevant to the dismissed retaliation claim,

those facts were also part of the totality of the circumstances amounting to a hostile work

environment.  Tr. 560:13-18.  The Court then read its proposed charge, which instructed

the jury not to consider the February 21, 2016 incident, the investigation, or Watkins'

termination when evaluating the merits of Watkins' hostile work environment claims or

damages.  Tr. 564:25-66:4.  Neither party objected, and the Court delivered the charge as

proposed.  Tr. 688:1-8, 691:20-92:4.

## II.     New Trial Standard

To grant a motion for a new trial under Federal Rule of Civil Procedure 59(a), a

district court "must conclude that the jury has reached a seriously erroneous result or that

the verdict is a miscarriage of justice, *i.e.*, it must view the jury's verdict as against the

weight of the evidence." *Mugavero v. Arms Acres, Inc.*, 680 F. Supp. 2d 544, 558

(S.D.N.Y. 2010) (citing *Manley v. AmBase Corp.*, 337 F.3d 237, 245 (2d Cir. 2003).  But,

"[i]n weighing the evidence . . . the Court should not ordinarily ignore the jury's role in

resolving factual disputes and assessing witness credibility."  *Mugavero*, 680 F. Supp. 2d

at 558-59 (citation omitted).  A court should only grant a Rule 59 motion for a new trial

when the jury's verdict is "egregious," and thus should rarely disturb a jury's evaluation of witness credibility. *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 134 (2d Cir. 1998) (citations omitted); *accord Raedle v. Credit Agricole Indosuez*, 670 F.3d 411, 418 (2d Cir. 2012) (holding that the jury's evaluation of witness credibility merits a "high degree of deference," and "jury verdicts should be disturbed with great infrequency"), *cert. denied*, 568 U.S. 1068 (2012).  Indeed, the Second Circuit has held that "[w]here the resolution of the issues depended on assessment of the credibility of the witnesses, it is proper for the court to refrain from setting aside the verdict and granting a new trial." *Metromedia Co. v. Fugazy*, 983 F.2d 350, 363 (2d Cir. 1992), *abrogated on other grounds as noted in Yung v. Lee*, 432 F.3d 142, 147 (2d Cir. 2005); *see also, e.g.*, *Zhiwen Chen v. Cty. of Suffolk*, 927 F. Supp. 2d 58, 67 (E.D.N.Y. 2013) (holding that "it would be improper to grant a new trial under these circumstances as the issue of the force exercised by defendants was dependent on the assessment of the credibility of the witnesses") (citation omitted).  "[O]ur precedent counsels that trial judges must exercise their ability to weigh credibility with caution and great restraint, as a judge … may not freely substitute his or her assessment of the credibility of witnesses for that of the jury simply because the judge disagrees with the jury." *Raedle*, 670 F.3d at 418 (citation omitted).

 In sum, in assessing the instant motion, the court is mindful:

> (1) that [Plaintiff] had the burden of proving by a preponderance of the evidence each of the elements of her claims against each defendant; (2) that a defendant has the burden of proof with respect to affirmative defenses, . . . ; (3) that the weight of the evidence, while a basis for argument to the jury, is not a ground for reversal on appeal; and (4) that a jury is entitled to believe part and disbelieve part of the testimony of any given witness, and its assessments of witness

> credibility and its choices between competing factual inferences are
> not to be second-guessed.

*Lore v. City of Syracuse*, 670 F.3d 127, 149-50 (2d Cir. 2012) (citations omitted).

## III.   Discussion

### A.   Hostile Work Environment under Section 1981

To succeed on hostile work environment claim under section 1981, a plaintiff

must show that her workplace was "permeated with discriminatory intimidation, ridicule,

and insult, that was sufficiently severe or pervasive to alter the conditions of her

employment and create an abusive working environment." *Bermudez v. City of New

York*, 783 F. Supp. 2d 560, 578 (S.D.N.Y. 2011) (citing *Harris v. Forklift Sys., Inc.*, 510

U.S. 17, 21 (1993)).  The test is both objective and subjective:  "the conduct complained

of must be severe or pervasive enough that a reasonable person would find it hostile or

abusive, and the victim must subjectively perceive the work environment to be abusive."

*Isbell v. City of New York*, 316 F. Supp.3d 571, 591 (S.D.N.Y. 2018) (citing *Littlejohn v.

City of New York*, 795 F.3d 297, 321 (2d Cir. 2015)).  The offending incidents must be

"more than episodic" and "sufficiently continuous and concerted in order to be deemed

pervasive." *Littlejohn*, 795 F.3d at 321 (citation omitted).  The conduct must also be

because of the plaintiff's race. *Colon v. Fashion Inst. of Tech.*, 983 F. Supp. 2d 277, 292

(S.D.N.Y. 2013) (citation omitted).  In evaluating a hostile work environment claim, one

must consider "the totality of the circumstances, including 'the frequency of the

discriminatory conduct; its severity; whether it is physically threatening or humiliating, or

a mere offensive utterance; and whether it unreasonably interferes with an employee's

work performance.'" *Littlejohn*, 795 F.3d at 321 (quoting *Harris*, 510 U.S. at 23).

When the harassing employee is a non-supervisory coworker, the employer is vicariously liable only if a plaintiff can prove the employer "provided no reasonable avenue for complaint or knew of the harassment but did nothing about it." *Charley v. Total Office Planning Servs. Inc.*, 202 F. Supp. 3d 424, 429 (S.D.N.Y. 2016) (citing *Whidbee v. Garazarelli Food Specialties*, *Inc.*, 223 F.3d 62, 72 (2d Cir. 2000)).  To impute the knowledge of the employees to the employer, the Second Circuit has long held

> an official's actual or constructive knowledge of harassment will be imputed to the employer when principles of agency law so dictate. That will be the case when (a) the official is at a sufficiently high level in the company's management hierarchy to qualify as a proxy for the company, or (b) the official is charged with a duty to act on the knowledge and stop the harassment, or (c) the official is charged with a duty to inform the company of the harassment.

*Duch v. Jakubek*, 588 F.3d 757, 763 (2d Cir. 2009) (citing *Torres v. Pisano*, 116 F.3d 625, 636-37 (2d Cir. 1997)).  A mere coworker's inaction does not trigger liability "*unless that co-worker has an official or strong de facto duty to act as a conduit to management for complaints about work conditions.*"  *Id.* (emphasis in original).

Plaintiff argues that the February 21, 2016 incident and the subsequent investigation should have been considered among the totality of the circumstances contributing to a hostile work environment and that their exclusion prejudiced her claims. Docs. 107, 12-14; 112, 1-6.

As a preliminary matter, Plaintiff alleges that "this was a close case alleging a racially hostile work environment[,]" and that her testimony concerning the "extensive overt racial harassment inflicted by Jenkins" was essentially "unrebutted."  Doc. 107, 1, 14.  She is wrong on both counts.  The evidence adduced at trial was not remotely

close.  Of the seven percipient witnesses called at trial—including the two fellow students

called by Watkins—*only* Watkins testified to Jenkins' alleged racial harassment.  All of

the other witnesses who were in the room where the harassment allegedly took place

specifically denied her testimony that they heard any such harassment.  *See supra* Part

I.A.  In addition, despite asserting on direct examination that she was subjected to near

daily harassment at the hands of Jenkins for the entirety of her employment, she

acknowledged on cross-examination that she and Jenkins were in the same classroom for

only the first three months of her employment.  Tr. 199:25-200:3.  Plaintiff also

concedes, as she plainly must, that there was nothing "explicitly racial" about Jenkins'

outburst the night of February 21.  Doc. 107, 12.  This, as discussed further below,

coupled with the fact that the incident was arguably instigated by Plaintiff as a result of

her turning the train on prematurely, calls into question her assertion that the February 21

incident was a "continuation of [Jenkins'] obsession with Plaintiff's skin color."  *Id.*

Moreover, in arguing that she was prejudiced by the preclusion of this evidence,

Plaintiff fundamentally misunderstands the nature of a hostile work environment claim.

As the Supreme Court has noted, "[h]ostile environment claims are different in kind from

discrete acts. Their very nature involves repeated conduct."  *Nat'l R.R. Passenger Corp.

v. Morgan*, 536 U.S. 101, 115 (2002) (citation omitted).  A hostile work environment

claim is "'not a vehicle for resurrecting []barred claims of discrimination and retaliation;

it is a wholly separate cause of action designed to address other types of work place

behavior, like constant jokes and ridicule or physical intimidation.'"  *Lioi v. New York

City Dep't of Health & Mental Hygiene*, 914 F. Supp. 2d 567, 591 (S.D.N.Y. 2012)

(quoting *Magadia v. Napolitano*, No. 06-CV-14386, 2009 WL 510739, at *17 (S.D.N.Y.

Feb. 26, 2009)).  "'The plaintiff cannot piggyback the discrete adverse acts about which he complains onto hostile work environment in order to make them actionable.'"  *Id.*

Lioi* is instructive.  In *Lioi*, the District Court dismissed plaintiff's retaliation claim because she failed to provide evidence that her termination for breaching the confidentiality agreement necessary to her work with medical information was pretextual.  914 F. Supp. 2d at 588.  The District Court further found the circumstances of her termination did not support her hostile work environment claim because she could not show how those circumstances related to any ongoing harassment on the basis of her sex. *Id.* at 591.  Similarly, Plaintiff's retaliation claim based on her termination for the February 21, 2016 incident and the investigation following it was dismissed on summary judgment.  Doc. 50, 13-18.  Defendant had asserted that Watkins was quickly fired following a brief investigation for violation of NYCTA Rule 10 prohibiting workplace altercations, and Plaintiff did not provide evidence to suggest that reason was pretext for discrimination.  Doc. 50, 15-18.  Plaintiff cannot now attempt to "resurrect[]" that claim by shoehorning the February 21, 2016 incident, which was not explicitly about race, and the ensuing investigation into its separate hostile work environment claims.  *Lioi*, 914 F. Supp. 2d at 591 (quoting *Magadia*, 2009 WL 510739, at *17).  Such evidence is also irrelevant to the surviving claims.  *Noel v. Inc. Vill. of Lake Success,* No. 13-CV-211, 2016 WL 740436, at *1-3 (E.D.N.Y. Feb. 24, 2016) (excluding evidence of dismissed hostile work environment claim as inadmissible in disparate treatment and retaliation trial, and noting "[t]he purpose of a motion *in limine* is *not* to provide a party with another opportunity to introduce facts and make arguments that were advanced and dismissed at summary judgment") (emphasis in original); *Hamza v. Saks Fifth Ave.*, *Inc.*,

No. 07-CV-5974, 2011 WL 6187078, at *7 (S.D.N.Y. Dec. 5, 2011) (holding evidence of dismissed disability discrimination claim irrelevant to retaliatory discharge claim).

Plaintiff relies on *Whidbee v. Garazarelli Food Specialties*, *Inc.*, for the proposition that evidence following the decision to fire an employee or for an employee to resign can be relevant to a hostile work environment claim. 223 F.3d at 70; Docs. 107, 13-14; 112, 6. But, in *Whidbee*, the post-resignation evidence consisted of two weeks of interaction between plaintiff and the offending co-worker. 223 F.3d at 70. Here, by contrast, following the February 21, 2016 incident, Watkins attended only one more day of class, without Jenkins, before her termination. Tr. 166:3-20, 167:13-15, 224:23-25:3. Because Watkins emphatically maintained that Jenkins was the sole perpetrator of discrimination against her, that remaining class could not have been relevant to her hostile work environment claim. Tr. 202:5-11.

Nor can Plaintiff rely on case law allowing admission of facially race-neutral incidents to support a hostile work environment claim for admission of the February 21, 2016 incident evidence. Doc. 107, 12. Facially race-neutral incidents may be considered under the totality of the circumstances standard for reviewing a hostile work environment claim only if "a reasonable fact-finder could conclude that they were, in fact, based on" the protected characteristic, which itself requires "some circumstantial or other basis for inferring that incidents [race-]neutral on their face were in fact discriminatory." *Alfano v. Costello*, 294 F.3d 365, 378 (2d Cir. 2002). Of course, Jenkins was the offending coworker prior to February 21, 2016. But, even assuming Watkins' testimony was taken as entirely true by the jury, there were two months between her last interaction with Jenkins and their altercation on February 21, 2016, and Jenkins had not said anything to

her during the walk to the train.  Tr. 199:25-200:3.  Moreover, the February 21, 2016

incident appears wholly unrelated to any prior harassment, as the incident was

sufficiently startling to have elicited a spontaneous reaction from Jenkins, and Jenkins did

not say anything Watkins considered racially-charged in her reported tirade.  Tr. 139:17-

41:22, 157:3-4, 518:2-6, 542:2-15; Doc. 106-3, 7-8.  *Cf. Kaytor v. Electric Boat Corp.*,

609 F.3d 537, 549 (2d Cir.2010) (finding no evidence to suggest sex-neutral but

threatening comments were related to work performance).  In fact, Jenkins' reaction,

mentioning Watkins' Army service, was more consistent with Stanislaus' testimony that

Jenkins disliked Watkins because of her representation of her Army career, than with

discriminatory intent.  Tr. 141:16-22, 323:3-24:13.  And, prior to the February 21, 2016

incident, only some of Jenkins' alleged comments were explicitly related to race.  *See*

*supra* 2 n.2-3, 6; *Alfano*, 294 F.3d at 376-81 (finding District Court should have granted

defendant's motion for judgment as a matter of law on hostile work environment claim in

part because, out of twelve alleged instances of discrimination, only four were explicitly

related to sex and only one other could plausibly be related to sexual animus). There is

thus no compelling basis to suggest that the February 21, 2016 incident should have been

considered by the jury alongside Jenkins' previous comments.

The Court also has the discretion to restrict evidence that would confuse the jury,

as this evidence easily could have.  *U.S. v. Fasciana*, 226 F. Supp. 2d 445, 455 (2d Cir.

2002) (holding courts have "wide discretion" in admissibility decisions and can exclude

even relevant evidence for, *inter alia*, unfair prejudice or jury confusion under Rule 403).

Had the February 21, 2016 evidence been considered by the jury, the jurors might have

thought that they were required to assess the investigation and Watkins' termination for

any retaliation by NYCTA for her complaint, issues that had already been resolved on summary judgment.  Docs. 50, 13-18; 111, 19.  Admitting that evidence would have therefore prejudiced NYCTA, in whose favor the retaliation issue had already been decided.  Doc. 111, 18-20.

In addition, if the jury were to have considered the February 21, 2016 evidence, the jury may not have credited Watkins' testimony that she was apologetic and largely silent in the face of Jenkins' verbal assault.  Tr.140:6-24  That testimony was directly rebutted by Stanislaus, Hall, and TSS Barnwell and Afflick, who all testified to an altercation between both women.  Tr. 322:2-23:11, 442:15-24, 514:23-25, 515:8-14, 585:15-86:6.

Turning to the evidence before the jury, the jury could easily have found that Jenkins did not make the comments Watkins attributed to her or that, if she made them, her comments were not continuous enough to support a claim under Federal law. Watkins admitted that, before February 21, 2016, she had not been in class with Jenkins for two months.  Tr. 199:25-200:3.  *Littlejohn*, 795 F.3d at 321 (citation omitted).  The jury may also have credited Stanislaus' testimony that Jenkins' comments were not racial, but instead motivated by Watkins' embellishment of her military service. Tr. 322:12-24:13.  *Colon*, 983 F. Supp. 2d at 292.  Stanislaus' testimony would have been bolstered by Watkins' own testimony on cross-examination when she was confronted with the discrepancies in her description of her military service at different times.  Tr. 85:13-86:5, 222:11-23:9, 267:14-69:11.

The jury could also have found that Watkins' subjective experience of Jenkins' comments was not abusive enough to sustain her claim.  Watkins testified that she did

well in class despite the comments.  Tr. 252:13-15.  *Littlejohn*, 795 F.3d at 321 (quoting *Harris*, 510 U.S. at 23).  Her husband also testified that by mid-October, two weeks into her class, Watkins was doing better emotionally.  Tr. 360:8-25, 371:14-72:2.

And, though the jury never reached the issue of vicarious liability, had they, the jury could have believed the five instructors who testified that they never heard Jenkins make comments about Watkins.  Tr. 465:9-66:18, 485:11-88:7, 499:23-500:22, 519:7-21, 588:12-23.  The jury could also have credited their testimony that, had Watkins told them of the discrimination she was facing, they would have urged her to fill out a G2 and escalated it to their supervisors.  Tr. 467:23-68:5, 488:23-89:20, 501:9-19, 518:22-19:6, 589:1-6.  The jurors might also have believed Gibbs when she testified that the G2 process was part of the curriculum taught in NYCTA training.  Tr. 646:9-15.  *Charley*, 202 F. Supp. 3d at 429.

As the Court instructed, the jury "may accept so much of [a witness'] testimony as you deem true and disregard what you feel is false."  Tr. 697:6-7.  The jury is also "not required to accept testimony even though the testimony is uncontradicted and the witness's testimony is not challenged.  [The jury] may decide because of the witness's bearing or demeanor, or because of the inherent improbability of the testimony, or for other reasons sufficient to [them]selves that the testimony is not worthy of belief."  Tr. 697:8-13.  Where, as here, the outcome of the trial "turn[s] to a large extent on the credibility of the witnesses who testified before the jury, the finding and the verdict which follow[] are particularly ill-suited to after-the-fact second guessing."  *See ING Global v. United Parcel Serv. Oasis Supply Corp.*, 757 F.3d 92, 99 (2d Cir. 2014).  *See also Wilson v. Hanrahan*, No. 12-CV-6024, 2019 WL 1386735, at *6 (E.D.N.Y. 2019)

("Having reviewed the trial transcript, I think both of these witnesses had credibility problems. It was up to the jur[y] to resolve those problems, and it did."); *Magnoni v. Smith & Laquercia, LLP*, 701 F. Supp. 2d 497, 505 (S.D.N.Y. 2010) ("Adjudication of Magnoni's hostile work environment claim in this case fundamentally rests upon a credibility determination."); *Beyar v. City of New York*, No. 04-CV-3765, 2007 WL 1959010, *2 (E.D.N.Y. June 29, 2007) ("The re-weighing of the credibility of testimony is not the function of the Court, and the Court declines to find that [the employer] was so lacking in credibility as a witness that a new trial is warranted."); Doc. 107, 14 ("this case turned on testimonial credibility").  Accordingly, Plaintiff's motion for a new trial on her Federal hostile work environment claim is denied.

### B.      Hostile Work Environment under NYCHRL

The standard to prevail on a hostile work environment claim under NYCHRL is lower.  *Bermudez*, 783 F. Supp. 2d at 579. One must show only "unequal treatment based upon membership in a protected class."  *Nieblas-Love v. New York City Hous. Auth.*, 165 F. Supp. 3d 51, 68 (S.D.N.Y. 2016) (citation omitted).  In other words, a plaintiff must show that she was "treated 'less well' because of discriminatory intent."  *Colon*, 983 F. Supp. 2d at 292 (quoting *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 110 (2d Cir. 2013)).  In evaluating a hostile work environment claim, the court must again look at the "totality of the circumstances."  *Mihalik.*, 715 F.3d at 111 (citing *Hernandez v. Kaisman*, 103 A.D.3d 106, 115 (1st Dep't 2012).

Under the NYCHRL, however, an employer will be liable for the discriminatory behavior of a nonsupervisory employee only if:

. . .

> (2) The employer knew of the employee's or agent's discriminatory
> conduct, and acquiesced in such conduct or failed to take immediate and
> appropriate corrective action; an employer shall be deemed to have
> knowledge of an employee's or agent's discriminatory conduct where that
> conduct was known by another employee or agent who exercised
> managerial or supervisory responsibility; or
> (3) The employer should have known of the employee's or agent's
> discriminatory conduct and failed to exercise reasonable diligence to
> prevent such discriminatory conduct.

N.Y.C. Admin. Code § 8-107(13)(b).  An employer can also avoid liability by proving, by a preponderance of the evidence, the affirmative defense that the offending conduct "consists of nothing more than what a reasonable victim of discrimination would consider 'petty slights and trivial inconveniences.'"  *Mihalik.*, 715 F.3d at 111 (citing *Williams v. N.Y.C. Hous. Auth.*, 61 A.D.3d 62, 80 (1st Dep't 2009)).

Under this standard, Plaintiff's claim still fails for similar reasons.  The events surrounding Watkins' termination are not relevant to the hostile work environment claim under the NYCHRL that survived summary judgment.  *See Magadia*, 2009 WL 510739, at *17 (finding barred termination claim could not be "resurrect[ed]" within hostile work environment claim under section 1981); *Thomas v. iStar Fin., Inc.*, 629 F.3d 276, 278, 281 (2d Cir. 2010) (affirming verdict for the plaintiff on retaliatory termination claim following summary dismissal of a hostile work environment claim and refusing to resurrect hostile work environment claim); *Kim v. Goldberg, Weprin, Finkel, Goldstein, LLP*, 120 A.D.3d 18, 26-27 (1st Dep't 2014) (dismissing hostile work environment claim under NYCHRL on summary judgment, but submitting retaliatory termination claim to the jury).  Moreover, had evidence of the February 21, 2016 incident been admitted, it

may have been more prejudicial than probative given the jury could have interpreted Watkins as an aggressor in her final altercation with Jenkins.  *See supra* 22.

With respect to the evidence that was before the jury, the jury could have credited Stanislaus' testimony that Jenkins' conduct was based on Watkins' exaggeration of her military record and not her race.  Tr. 322:12-24:13. *Nieblas-Love*, 165 F. Supp. 3d at 68. Watkins admitted that she was only in the Army for three months, but counted her time as a volunteer for the VFW afterwards when she represented that she had over 10 years of Army experience in the complaint and wrote that she had 13 years of Army experience in her second G2.  Tr. 85:13-86:5, 222:11-23:9, 267:14-69:11; Doc. 1, ¶ 12.  In addition, there was scant evidence that Watkins was treated less well than other employees. Though the jury was not able to consider the circumstances of Watkins' termination, they were able to consider that Jenkins, the offending co-worker, had also been terminated by NYCTA for violating Rule 10.  Tr. 634:13-16.

Though the jury never reached NYCTA's affirmative defense that Jenkins' comments were petty slights and trivial inconveniences, if they had, the jurors could have found that, even if Jenkins' comments created a hostile work environment, they were petty and trivial.  *Mihalik.*, 715 F.3d at 111 (citing *Williams*, 61 A.D.3d at 80); Doc. 85. For two months of their five-month training program, Watkins and Jenkins were separated.  Tr. 199:25-200:3.  According to her husband, her mood improved by mid-October, two weeks after class started.  Tr. 360:8-25, 371:14-72:2.  Watkins did well in class in spite of Jenkins' behavior.  Tr. 252:13-15.  And, Watkins did not report Jenkins' behavior, even though she had a history of reporting discrimination at her previous job with JetBlue Airways.  Tr. 213:25-14:10.  These circumstances suggest that a reasonable

jury could have found the Defendant had proven the petty slights and trivial inconveniences defense by a preponderance of the evidence thereby relieving NYCTA of liability.[11]

As with the section 1981 claim, the jury never reached the question of whether NYCTA was liable for the hostile environment created by Jenkins, but even if the jury had, the jury could easily have believed the instructors that they never heard Jenkins' comments and that Watkins never reported them.  *See supra* 23; Doc. 85.

Like Watkins' claim under section 1981, her claim under NYCHRL also rests on the credibility of the evidence, which the fact-finder is charged with parsing.  *Magnoni v. Smith & Laquercia*, 483 F. App'x 613, 616 (2d Cir. 2012).  Accordingly, Plaintiff's motion for a new trial on her City hostile work environment claim is also denied.

### C.    Jury Instruction[12]

Jury instructions are intended to give the jury a clear and concise statement of the law applicable to the facts of the case.  *Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Ams.*, 727 F. Supp. 2d 256, 276 (S.D.N.Y. 2010) (quoting *Girden v. Sandals Int'l*, 262 F.3d 195, 203 (2d Cir. 2001)).  An erroneous jury instruction requires a new trial unless the error is harmless.  *Id.* (citation omitted).  "A jury instruction is erroneous if it

---

[11] Plaintiff requests that, if retrial were granted, the Court reconsider its decision to allow Defendant to amend their answer at trial to include this defense.  Doc. 107, 15-16.  However, the Second Circuit has held that, where a defendant has raised an affirmative defense at summary judgment, the summary judgment motion can be considered an amendment to their answer, absent "undue prejudice to the plaintiff, bad faith or dilatory motive on the part of the defendant, futility, or undue delay of the proceedings." *Saks v. Franklin Covey Co.*, 316 F.3d 337, 350-51 (2d Cir. 2003).  Here, NYCTA raised the affirmative defense at summary judgment and Plaintiff articulates no prejudice. Docs. 35, 12-13; 107, 15-16; 111, 23.

[12] Defendant argues that Plaintiff waived objection to the charge by not specifically objecting following delivery of the jury instructions.  Doc. 111, 20-21.  However, Plaintiff vociferously objected to both the exclusion of the February 21, 2016 incident evidence throughout trial, and the attendant charge to disregard it at the charging conference.  *See supra* Part I.A-B.  Plaintiff complied with Rule 51, which mandates that an objection to a jury instruction is timely if a party objects before the instructions.  Fed. R. Civ. P. 51(b)(2), 51(c)(2)(A).

misleads the jury as to the correct legal standard or does not adequately inform the jury

on the law." *Cameron v. City of New York*, 598 F.3d 50, 68 (2d Cir. 2010) (citation

omitted).  An error is harmless only if the court is convinced that the error did not

influence the jury's verdict.  *Aristocrat Leisure*, 727 F. Supp. 2d at 276 (quoting *Patalano*

*v. Am. President Lines*, 250 F. App'x 425, 427 (2d Cir. 2007)).  Because a trial court has

considerable discretion in the formulation and style of jury instructions, a new trial is

only warranted if, taken as a whole, the jury instructions gave a misleading impression or

inadequate understanding of the law.  *Id.* (quoting *Patalano*, 250 F. App'x at 427-28); *see*

*also Smith v. Tobon*, No. 04 Civ. 3286, 2012 WL 3705011, at *7 (S.D.N.Y. Aug. 28,

2012), *aff'd*, 529 F. App'x 36 (2d Cir. 2013) (noting that a jury instruction will be

deemed adequate if the charge, taken as a whole, is correct and sufficiently covers the

case so that a jury can intelligently determine the questions presented).

  Here, the jury instructions provided the jury with the correct legal standard and

adequately informed them of the law.  *See supra* Parts III.A-B.

  Plaintiff does not contest that, on the whole, the instruction accurately reflected

the standards governing claims under section 1981 and NYCHRL.  Doc. 107, 15.

Plaintiff only argues that, had the jury been allowed to consider the February 21, 2016

incident and the investigation that the jurors could have found that Gibbs did not

investigate or that her investigation was insufficient.  Doc. 107, 15.  But, that evidence

would have only related to the liability question the jury never reached, or the retaliation

claim that did not survive summary judgment.  Docs. 50, 13-18; 85.

   Moreover, even if the instruction to exclude evidence of the February 21, 2016

incident and NYCTA investigation was erroneous, it did not affect the outcome of the

case. *Aristocrat Leisure*, 727 F. Supp. 2d at 276 (quoting *Patalano*, 250 F. App'x at 427).  The events surrounding Watkins' termination from NYCTA were not likely to have been favorably viewed by the jury.  *See supra* 22 (noting significant evidence suggested that Watkins was also yelling at Jenkins during their final altercation).  Accordingly, Plaintiff's motion for a new trial based on an erroneous jury instruction is likewise denied.

**IV.  Conclusion**

For the reasons stated above, Plaintiff's motion for a new trial is DENIED. The Clerk of the Court is directed to terminate the motion. Doc. 105.

It is SO ORDERED.

Dated:    April 16, 2020
          New York, New York

_____
          Edgardo Ramos, U.S.D.J.